On April 11, 1946 Mrs. Nancy Sylina Young Hardy executed a last will and testament in olographic form in which she bequeathed to her nephew, William Iverson Watson, plaintiff in this proceeding, all the property she died possessed of and appointed him executor without bond.
Mrs. Hardy, the testatrix, died at her residence in the Parish of St. Helena on November 8, 1946. On January 9, 1947, the legatee under the will petitioned the district court for probate thereof. The will was duly probated and the legatee appointed executor in accordance with its terms as is shown by an order of court dated January 17, 1947. An inventory of the assets of the succession showed that the principal item was real estate consisting of 100 acres of land in Sec. 48, T. 4 S., R. 6 E., in the Parish of St. Helena which was appraised at the sum of $1,000. Movable property consisting of livestock, farming tools and household furniture was appraised at the sum of $325.
Shortly before all of this had taken place, that is, on November 20, 1946, Tom E. Young, one of the defendants in this proceeding, had presented the district court with a last will and testament in the non-cupative form by public act, appearing to have been made by Mrs. Hardy on November 4, 1946, in which he was made the residuary legatee of her estate. In his petition he had asked that the will be probated and that he be appointed testamentary executor. On the same day an order was issued by the court homologating that will and on December 9, 1946 on petition of the said Tom E. Young, of Dinah Warner, Buddy Warner and Mrs. Laura Watson to be recognized as legatees thereunder and sent in possession of their respective legacies, judgment was signed so recognizing them.
The judgment of court sent them in possession, each in his or her respective share of the same land which had been bequeathed to the legatee under the will of April 11, 1946, and the purpose of this suit which has been instituted by that legatee is to have the will of November 4, 1946, declared null, void and of no effect and also to have the will of April 11, 1946 recognized as being valid and that he be recognized under the said last will as the owner of all property left by the decedent at her death.
The grounds on which the will of November 4, 1946 is attacked are the following: (1) That the same was not dictated by the testatrix to the Notary before whom it was executed as is required by Article 1578 of the Revised Civil Code, but on the contrary that the Notary wrote the formal portion of the said will and then he wrote the disposing portion from a written memorandum handed to him before or at the time of the making of the said will by a third person; (2) that at the time of the signing of the said will, the testatrix did not have the mental capacity to understand what was transpiring and she did not have the physical capacity to dictate the said will as required under Article 1578 of the Civil Code; (3) that while the said will was being written by the Notary, and immediately before and after, the testatrix uttered no word whatever as she was physically unable to speak at that time; and (4) that when requested to sign the *Page 88 
said purported will the testatrix did not understand what she attempted to sign, and that she was held in a sitting position by others and was assisted in placing her signature to the said document.
To the plaintiff's petition, all the legatees made defendants appeared and in a joint answer denied all of the allegations made by the plaintiff and affirmatively averred that the will of November 4, 1946, executed before Charles C. Reeves, Clerk of Court of the Parish of St. Helena, under which they were made legatees, is valid and legal in every respect; that it revoked all former wills and consequently all the proceedings of probate attempted to be carried on under the will of April 11, 1946 are null and void and of no effect and should be erased from the records of the court. Further answering the defendants alleged that the plaintiff was fully aware of the validity of the proceedings taken for the probate of the decedent's last will and testament and despite his knowledge has persisted in having a will which had been revoked probated, all of which caused expense and inconvenience to them for which they are entitled to recover the sum of $100 in reconvention against the plaintiff, as well as the further sum of $100 for attorney's fees in defending this proceeding.
Upon trial of the case on the issues as thus made up, the district judge rendered judgment in favor of the plaintiff, decreeing the nullity of the purported last will and testament dated November 4, 1946 and recognizing the validity of the will dated April 11, 1946. The judgment further reserved to the plaintiff the right to claim from any of the purported legatees under the said will of November 4, 1946, any of the property belonging to this succession and in the event that it be not returned in kind he be reserved the right to claim the value thereof. The judgment rendered was signed in open court in the Parish of Tangipahoa on November 25, 1947, presumably by an agreement between counsel, and provides that the Clerk of Court of the Parish of St. Helena be notified of the decision of the court. The agreement apparently further provided that the court could grant an order of appeal to the party or parties aggrieved by the judgment.
On December 8, 1947 as appears from an extract of the minutes of the court an order was issued as follows: "Let order of appeal be granted to party cast in this case upon furnishing bond as required by law returnable to Court of Appeal on or before January 2, 1948." On December 19, 1947 Tom E. Young, one of the defendants, filed a bond in the sum of $250 for a devolutive appeal.
 Motion to Dismiss Appeal
The transcript of appeal was lodged in this court and the case was fixed for argument on the docket for February 3, 1948. On that day counsel for the appellee filed a written motion to dismiss the appeal on the ground that the judgment not being a monied judgment, the amount of the bond had to be fixed in the order of appeal if the appeal is considered as suspensive, and this the order does not do and, that if, on the other hand, the appeal is considered devolutive, it was likewise necessary for the court to fix the amount of bond and no such amount was fixed in the order granted.
Counsel for appellee resists the motion to dismiss on the ground that it was filed too late. He contends that the motion should have been filed within three days after the filing of the transcript in the Court of Appeal as otherwise the right to have the appeal dismissed is waived.
[1, 2] There are numerous decisions on the point involved and as we read them it seems that there is a difference in following the strict provisions of the three day limit, depending on whether the motion to dismiss is one which strikes at the very life or the basis of the appeal, or one which attacks the appeal on the ground of some irregularity in the order granting it or in the bond furnished by the appellant or some other matters relating to the appeal. If the motion to dismiss is based on the right of appeal itself either because the court is without jurisdiction or the judgment is one that is not appealable, the decisions hold that the three day limit does not apply and that the motion to dismiss may be filed after that period. On the other *Page 89 
hand if the motion is based on some informalities or irregularities in the order of appeal the decisions are to the effect that it must be filed within three days after the return date.
In this case as already stated the motion to dismiss is based on the ground that the order of appeal does not fix the amount of the appeal bond and in that connection 'we find a case decided by the Court of Appeal of Orleans Parish passing on this exact point and holding that the motion to dismiss based on the same ground as the one here urged, and which was filed several months after the transcript had been filed came too late. That is the case of Power v. Christina, 7 La. App. 651. The situation presented was strikingly similar to the one we have before us as the order of appeal merely granted a suspensive appeal to the defendant, returnable on a certain day "upon furnishing bond with good and solvent securities in accordance with law." The judgment not having been one for money, it was necessary that the court should have fixed the amount of the bond and the motion to dismiss was based on that omission. In discussing the proposition the Court of Appeal cited a host of cases showing the difference in matters of this kind where the motion has to be filed within three days after the transcript is filed and those where it may be filed at a later date. In discussing the situation as presented before it, the court stated: "It cannot be said that the appellant had no order of appeal, for the order is there. All that can be said is that the order contains an error or omission in not fixing the amount of the bond. That error or omission is protected by the prescription of three days in accordance with the authority quoted above."
In the case of Coreil v. Town of Welsh, 120 La. 557, 558, 45 So. 438, one of the grounds on which the motion to dismiss was based was that the appeal bond was illegal, being for an amount alleged to have been less than the law required. In disposing of that ground the court stated: "The alleged illegality of the appeal bond, it is easily disposed of; for it is settled that a motion to dismiss for informality in the appeal bond, insufficiency of the bond, or irregularity in the order of the appeal, or want of the latter, must be filed within three days after the record is filed."
The case of State v. Callac, 45 La. Ann. 27, 12 So. 119, is cited and on examination we find that it contains language almost similar to that just quoted.
In Haydel et al. v. Major, La. App., 19 So.2d 628, the Court of Appeal of Orleans Parish again had a similar motion under consideration. In that case the motion to dismiss the appeal was sustained. It was based on the proposition that in as much as the appeal had been taken during a term of court subsequent to the one in which the judgment was rendered, omission to pray for citation of appeal, or to cause the appellee to be cited was fatal to the appeal. The court in that case held that citation of the appeal was necessary to the appeal and that jurisdiction of the appellate court could not attach to the person of the appellee until citation had been issued and served. In discussing the question at issue the court again made the distinction between those cases where the motion strikes at the foundation or the right of appeal and those where it relates to some informality in connection with the order of appeal or the bond for appeal, and the reason that it sustained the motion to dismiss was because the matter involved was one which affected the very right of appeal or the jurisdiction itself of the appellate court.
[3] We are satisfied that in the case before us, under the decisions cited, the motion to dismiss, having been filed two weeks after the transcript had been lodged in this court, it was filed too late and consequently it is hereby overruled.
 On the Merits
On the merits of the case we are concerned with a question of fact on which we are to determine whether in the execution of the will that is attacked, the requirements of Article 1578, R.C.C., were complied with.
That Article relates to noncupative wills by public act and it provides that such a will must be received by a Notary Public *Page 90 
in the presence of witnesses and moreover that it must be "dictated by the testator, and written by the notary as it is dictated." It is with this last requirement that we are particularly concerned in the case.
This testatrix had made her last will and testament on April 11, 1946, seven months preceding the time when the will that is under attack was executed. The first will was in olographic form and there seems to be no question but what it was properly drawn and is a perfectly valid will unless it was revoked by the later will. There is no suggestion on the part of any one that at the time she made the will in April, 1946, the testatrix was not in sound health with the possible exception of a heart ailment. There is nothing whatever to indicate that she was prompted by any other motive but her own in having made that will.
The circumstances under which the will of November 4, 1946 was made were entirely different. At that time she was apparently in a serious condition physically as she died only four days later. The testimony leaves us with the impression that the suggestion to make a new will did not come from her but was prompted by someone else. She evidently was too feeble to write a will herself and that is why it became necessary to have one drawn in noncupative form by public act. The Notary who drew up the will was the Clerk of Court of the parish and he was also one of her nephews. Word reached him on the morning of the date of the will that he was wanted at the home of the testatrix for the purpose of having it executed. The message appears to have been either given or sent to him by Mrs. Annie Reeves Morgan, his sister, a niece of the testatrix, and also of the principal legatee under the will, Tom E. Young.
There were several people at the house of the testatrix when the Notary arrived. He testified that he spoke to his aunt and told her he understood she wanted him to prepare her will and she told him that she did. He thought she was in physical and mental condition to do so and no one scorns to dispute the fact that he was perfectly honest and sincere in all that he says and did. After speaking to her and finding out that she wanted him to prepare the will he brought his typewriter in the room and placed it on a table next to the bed where she lay. He prepared the formal part of the will and then he says some one handed him a slip of paper on which he found written the various bequests she wanted to make. He says he does not recall who gave him that slip of paper but we feel satisfied that what he wanted to say was that it was given to him by some one other than the testatrix herself and that it was not written by her. After receiving the slip of paper he says that he asked the testatrix if that was what she wanted to put in the will and that she said yes. He then copied into the disposing portion of the will what was written on that paper. He then finished writing the remaining part of the will and read the whole of it before the witnesses who had been summoned and presented it to the testatrix for her signature. He says that she was able to sign and although some one attempted to help her in doing so she would not let them.
A part of the testimony of the Notary is contradicted by the testimony of several of the other witnesses, especially that part wherein he said he asked the testatrix if what was contained on the slip of paper expressed her wishes and she said yes, also that he read the will over to her and asked her if that was her will and she again said that that was what she wanted and also to that part which relates to her signing the will. Several witnesses testified that this lady was so weak that she had to be propped up with several pillows and that she could not even finish signing her name. Although as we have said, he did not seem to remember who had handed him the slip of paper on which the bequests were written, it is shown by the testimony of Mrs. Morgan herself that she is the one who had written them although she says she did so at the request of the testatrix.
We think therefore that we can accept as the facts in the case that this old lady was very feeble and that she certainly did not dictate the will to the Notary in *Page 91 
so many words and that all he did was to copy from this slip of paper what he found written in the hand of another person and that at most he asked the testatrix if that was what she wanted and she said yes. Under those facts we don't think that there was a compliance with the formalities and the requirements of Article 1578 of the Code which prescribes that the "testament must be dictated by the testator, and written by the notary as it is dictated." We are aware that there are some decisions of the Supreme Court holding that under certain situations and facts under which such a will was drawn, even though there was not an absolute compliance with the letter of the law itself, the substantial compliance found was held to be sufficient. Such a case is Succession of Beattie, 163 La. 831, 112 So. 802, in which it was shown to the court that the testatrix had in effect dictated her will to the Notary who made mental notes thereof and then reduced them to writing in the will itself. The verbiage used by him may not have been her exact words but in as much as it substantially conveyed the wishes she had expressed, it was held that there was sufficient compliance with the requirements of the law with regard to the dictation and the will was upheld. That case is the one relied on principally by the defendants who are trying to uphold the will in this case. We believe however that the facts are different because in that case the testatrix did speak to the Notary herself and expressed orally to him her wishes in regard to her bequests whereas in this case the Notary merely copied what was written on a slip of paper by some one else and satisfied himself by asking the testatrix if that was what she wanted.
A case which we believe is more in point and which we think should govern us in deciding the one before us is that of Succession of Theriot, 114 La. 611, 38 So. 471, 473. The facts, if anything, were stronger from the standpoint of those who were trying to uphold the will. In that case also the Notary copied the bequest in the will from written memoranda but the memoranda had been handed to him by the testator himself and that is why we say the case is stronger from the standpoint of the validity of the will. Quoting from the opinion of the court in its comments on the facts, we find that "the testator was an old man and very deaf. When the notary approached his bedside, the decedent handed him a piece of paper on which certain testamentary dispositions had been written, saying at the same time, 'comme ca' (like that). This was all that was said by the testator during the confection of the instrument, and all the witnesses concur in the statement that he was too deaf to hear anything that was said by the notary."
[4] The Court found, as we do in this case, that the Notary acted in perfect good faith and stated that "he considered that the acts and declarations of the testator were equivalent to a dictation. He went so far as to say that the language of the testament came from the lips of the testator, and not from the written paper. But it is manifest from his testimony that the language came from the paper." It is equally obvious from the testimony of the Notary in this case that the language of the testament came from a slip of paper that was not even handed to him by the testatrix but by a third party who by her own admission had prepared it herself. We can well adopt the concluding words of the Supreme Court in the cited case on this point which are as follows: "It would be useless to pursue the subject further, as it is indisputable that the testament was not dictated by the testator in any manner, form, or shape, and was therefore a nullity."
Judgment affirmed at the costs of the defendant, appellant herein.